IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 6, 2016 Session

**IN RE JERAMYAH H., ET AL.**

**Appeal from the Juvenile Court for Rutherford County**
**No. TC2491  Adam T. Dodd, Magistrate**
_____

**No. M2016-00141-COA-R3-PT – Filed October 31, 2016**
_____

Father appeals the termination of his parental rights to his two children.  The juvenile court terminated his parental rights on three grounds: abandonment by willful failure to support, failure to provide a suitable home, and persistence of conditions preventing reunification.  The court also found clear and convincing evidence that termination of parental rights was in the children's best interests.  After reviewing the record, we conclude that DCS did not meet its burden of proving, by clear and convincing evidence, the grounds of failure to provide a suitable home or persistence of conditions.  But, we conclude that there was clear and convincing evidence of willful failure to support and that termination was in the best interests of the children.  Therefore, we affirm the termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Brandon M. Booten, Murfreesboro, Tennessee, for the appellant, Johnny H.

Herbert H. Slatery III, Attorney General and Reporter, and M. Cameron Himes, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Robyn B. ("Mother") is the biological mother of Jeramyah H., James R., and Kaydee H.  Johnny H. ("Father") is the biological father of Jeramyah, who was born in August 2008.  Subsequently, Mother married Nathan R., who is the biological father of James, born May

2011. Father also married and had a child with another woman. Nevertheless, Mother and Father resumed their relationship sometime in late 2012 after Nathan R. entered court-ordered drug treatment. Mother gave birth to Kaydee in July 2013, and it was later determined that Father is Kaydee's biological father. Because Mother remained married, Nathan R. is the legal father of Kaydee.

On July 30, 2013, DCS received a referral that Mother had exposed her children to drugs. Kaydee was born with methadone in her system, and she experienced significant withdrawal symptoms, causing her to be hospitalized for several days. DCS removed all three children from Mother's custody on August 30, 2013. Mother and Father agreed to an Immediate Placement Agreement, whereby Jeramyah and Kaydee were released to Father and Father's mother ("Paternal Grandmother").[1]

As a condition to the agreement, Father was not permitted to allow the children to have contact with Mother outside of supervised visitation. The children were also not permitted to be placed with Mother's mother ("Maternal Grandmother"). On October 3, 2013, DCS learned that Jeramyah and Kaydee were staying at Maternal Grandmother's home, which is where Mother resided. Because Father violated the terms of the Immediate Placement Agreement, the Juvenile Court of Rutherford County, Tennessee, entered a protective custody order bringing the children into state custody on October 4, 2013. On December 4, 2013, Mother and Father consented to an order adjudicating the children dependent and neglected based on improper control.

Following the children's removal, DCS and the parents developed an initial permanency plan. Specifically, the plan included the following requirements for Father: (1) follow all rules of probation and not incur new criminal charges; (2) obtain legal means of income and provide documents to DCS substantiating income; (3) obtain stable housing for a minimum of three months and provide DCS with a copy of the lease; (4) develop a written budget; (5) participate in a parenting class; (6) develop a written child care and transportation plan; (7) participate in a clinical assessment with a parenting component and follow all recommendations; and (8) abide by court orders and cooperate with DCS. The permanency plan was amended three times between October 2013 and January 2015, but each amended plan incorporated the same action steps from the initial plan.

On July 21, 2014, DCS filed a petition to terminate the parental rights of Mother to all three children and to terminate Father's rights to Jeramyah and Kaydee. The petition also sought to terminate Nathan R.'s rights to James. The case was originally set for hearing in October 2014 and trial in November 2014, but the matter was continued, first due to Mother

---

[1] James was placed in a foster home because his father, Nathan R., was undergoing drug treatment and DCS was unable to locate him.

and Father's progress and then due to a scheduling conflict with the court. Trial was ultimately held on May 18, August 17, and September 25, 2015. At the start of the second day of trial, DCS announced a voluntary nonsuit of its petition against Nathan R. and Mother as to James.[2] Over the objection of Father's counsel, the juvenile court permitted the trial to proceed as to the other two children.

## A. PROOF AT THE HEARING

### 1. Father's Relationship with Mother

At the time of Kaydee's birth in 2013, Father was living with Paternal Grandmother. Mother was living with Maternal Grandmother, and the children were not permitted to have unsupervised contact with her due to her drug abuse. DCS encouraged Father to obtain his own residence, so he moved out of Paternal Grandmother's home in October 2013 after the children entered DCS custody.

In February 2014, Mother entered drug treatment. Upon her release in July of that year, Mother demonstrated that she was clean and sober and that she intended to cooperate with DCS. Mother and Father moved in together in July 2014, signing a two year lease. The following month, the parents began to attend scheduled, supervised visitations with the children together. For several months after Mother's release from rehab, Mother and Father worked to meet their permanency plan requirements as a family unit. In January 2015, Mother and Father were permitted several unsupervised visits with the children.

However, on February 28, 2015, Father was charged with domestic assault against Mother, and due to a no contact order, Mother moved out of Father's home. A few days after his release, Father was again arrested for having contact with Mother, which violated the terms of his release. The caseworker assigned to the parents' case testified that Mother began to show signs of relapse after the domestic assault incident. Mother has not visited with her children, cooperated with drug screens, or kept in regular contact with her caseworker since February 2015.[3] Around that same time, Mother informed the caseworker that she was pregnant with her fourth child.

---

[2] DCS first asked the court to bifurcate the matters and continue the issue of termination of parental rights as to James until a later date because, according to DCS, Nathan R. had "made great strides" in completing his permanency plan requirements. When the court denied the motion, DCS announced a nonsuit as to James.

[3] Mother submitted to a hair follicle drug screen in early February 2015, and the screen came back negative. But on March 2, 2015, Mother refused to submit to a drug screen, and afterward, she began avoiding her DCS caseworker's phone calls.

3

Sometime in March or early April 2015, Mother and Father expressed to DCS their desire to resolve their issues and live together as a family once again. Presumably, this was because Mother was pregnant with Father's child. It is disputed if Mother and Father were actually living together at this time. Mother claimed that she was living with Maternal Grandmother while Father told the caseworker that Mother was staying at both his place and with Maternal Grandmother. However, according to DCS, Maternal Grandmother denied that Mother was living in her home. The parents sought a peaceful contact order, but by the time they were able to obtain it, the couple had ended their relationship. Because Mother was still refusing to comply with drug screens, DCS expressed concern that Mother remained on Father's lease and had access to his home.

On August 12, 2015, Father was evicted from the residence that he had shared with Mother.[4] Later that month, Father moved to a new apartment, where he claimed that he lived alone. After a scheduled home visit conducted shortly after he moved, DCS was satisfied that the home was appropriate and that Mother did not reside there.

In September 2015, Mother gave birth to another child, her third with Father. According to Father, he was permitted to take the newborn home from the hospital to stay with him, while Mother returned to Maternal Grandmother's home. Later that month, on September 22, 2015, Mother and the newborn were found at Father's home on an unannounced visit by DCS. Mother claimed that she was only visiting, explaining that she still lived with Maternal Grandmother. Mother again refused to submit to a drug screen. Father was not present at the residence at the time. He testified that Paternal Grandmother had come to his apartment that morning to care for the baby while he was at work and that Paternal Grandmother allowed Mother to come visit with his permission.

2. Child Support

At trial, Father conceded that he has never paid child support for Jeramyah or Kaydee. At a hearing in the juvenile court on December 4, 2013, Father was ordered to begin paying fifty dollars per month for each child on March 1, 2014. Father first testified that it was his belief that the juvenile court reserved ruling on the child support matter until a later date because Father's attorney was not present at the hearing. However, the order resulting from the hearing showed that both Father and his attorney were present, and Father could not produce documentation of any such continuance.

Father also testified that he was not able to pay child support because he never received a Tennessee Child Support Enforcement System (TCSES) case number, which would allow him to make child support payments. But Father admitted that he never sought

---

[4] Though he testified that he voluntarily broke the lease to remove Mother's name from it, evidence at trial showed that he was evicted.

4

out a TCSES number from DCS or attempted to mail a check to the address provided to him in the court's order. DCS provided Father with a TCSES number following the first trial date on May 18, 2015, but he still had not made a payment as of the last day of trial, four months later.

As for income, evidence at trial showed Father had two different jobs between October 2013 and trial. At the time of removal, he was working for PepsiCo, where he earned $15.25 per hour. Father testified that he worked 60 or 70 hours per week and that for his overtime, he was compensated at time and a half.[5] Father gave inconsistent testimony about the timing, but it is clear that he was fired from PepsiCo sometime in 2014.[6] After he was fired, Father became self-employed as a subcontractor. He was then paid by the job and compensated his crew from the checks he received from the contractors who hired him. Father testified that, due to these factors, his personal income fluctuated, but he claimed to make between $500 and $1,000 per week as a subcontractor. He estimated that his median income was $700 per week.

Testimony suggested that, at the time of trial, Father's financial obligations included monthly rent, probation costs, child support payments toward his child with his current wife, various business expenses related to his work as a subcontractor, insurance payments, and two car payments. After moving out of Paternal Grandmother's home in October 2013, Father moved into an apartment where he paid about $900 per month in rent. He then moved into a house with Mother in July 2014, where his rent was $650 per month. Stemming from his 2013 criminal charge for theft, Father claimed to still owe $1,200 in probation costs. Father also testified that he was ordered to pay $200 per month in child support to his current wife.

3. Cooperation with DCS and Compliance with the Permanency Plan

Father completed the parenting class required by the initial permanency plan on November 1, 2013. On March 27, 2014, Father also completed the clinical assessment required by the plan. The assessment recommended Father participate in parenting education and in visitation services so that his interaction with his children could be observed and assessed. DCS secured funding for Father to obtain these services, which began in May 2014. The testimony of Father and DCS caseworkers also indicated that Father both

---

[5] Father testified that he received overtime pay for any hours worked in a week in which he had already exceeded 40 hours. We note, though the juvenile court did not, that if Father averaged a 60-hour work week, these figures suggest that he made approximately $1,067.50 per week before taxes.

[6] Father first testified that he was fired from PepsiCo in the fall of 2014, but he later testified that he had already been fired as of July 2014. Further, an amended permanency plan developed on April 7, 2014, states that DCS required an updated budget from Father because he had changed jobs.

5

provided DCS copies of his leases after each of his moves and maintained regular visitation with the children since their removal.

The permanency plan was amended on July 7, 2014, adding the requirement that Father attend anger management due to outbursts with DCS staff. Father completed the course in November 2014, but DCS recommended a second anger management course following his charge of domestic assault against Mother. Father failed to attend the class scheduled by DCS in July 2015. Additionally, evidence at trial established that Father was employed at all relevant times, but his DCS caseworker testified that she had difficulty obtaining pay stubs or copies of paychecks from Father as proof of income. The caseworker also indicated that Father was not cooperative in developing a child care and transportation plan.

However, Father completed these requirements prior to the last day of trial in September 2015. He provided DCS with a budget, sufficient proof of income, and a child care and transportation plan, and he completed the second anger management course.

4. The Children

Kaydee and Jeramyah have remained in state custody since their removal from Father's home in October 2013. At that time, they were placed in a foster home with their half-brother, James. All three children were moved into a pre-adoptive foster home in June 2014. At the September 25, 2015 hearing, the children's foster father testified that it was their intent to adopt Kaydee and Jeramyah. He also testified that James was still placed in the family's home and that the foster family intended to allow the children to maintain their relationship with their half-brother should he be returned to Nathan R. The DCS caseworker testified that the children's foster placement is a good, supportive home for the children where all their needs are met.

In July 2014, Jeramyah started attending counseling sessions with a mental health provider because he was struggling to adjust to his placement in foster care. Jeramyah's counselor testified that Jeramyah initially expressed anger at his parents for being in foster care. To allow him to express these feelings, the counselor held family sessions with Jeramyah and his parents in December 2014 and January 2015. The counselor testified that the sessions generally went well, but she stated that the parents became very defensive and angry when Jeramyah tried to discuss his feelings, causing him to become upset and withdraw. Family counseling sessions ceased upon Father's domestic assault charge. Afterward, the counselor refrained from continuing joint sessions with Father because Jeramyah continually expressed to her that he is fearful of Father, specifically when Father is angry.

6

## B. JUVENILE COURT'S FINAL ORDER OF GUARDIANSHIP

On December 17, 2015, the juvenile court entered an order terminating Mother's and Father's parental rights to Jeramyah and Kaydee. The court found DCS had proven all five grounds for termination against Mother by clear and convincing evidence. As to Father, the court found DCS had proven three of the five grounds alleged by clear and convincing evidence: abandonment by willful failure to support, persistence of conditions, and failure to provide a suitable home. The court specifically stated Father was not a credible witness due to his 2013 conviction for theft, his demeanor at trial, his conflicting testimony, and his continuing assertions that he did not have an ongoing relationship with Mother. After reviewing the statutory factors, the court also found that it was in the children's best interests to terminate Mother's and Father's parental rights.

## II. ANALYSIS

Mother did not file an appeal following the juvenile court's order, so our review is limited to the termination of Father's parental rights. On appeal, Father argues the juvenile court erred in its analysis of the three grounds for termination found against him, and he also contends the court erred in its analysis of the children's best interests. DCS contends that the juvenile court properly terminated Father's parental rights but argues the court erred in finding that DCS did not meet its burden of proving substantial noncompliance with the permanency plan against Father. DCS concedes that it did not establish the ground of abandonment by willful failure to visit.

## A. STANDARD OF REVIEW

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putman v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). However, parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g) (Supp. 2015).

Tennessee Code Annotated § 36-1-113 sets forth the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). Second, they must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, the parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *In re Bernard T.*, 319 S.W.3d at 596. "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). Additionally, this Court gives great weight to the credibility accorded to a particular witness by the trial court. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

In termination proceedings, "the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007). We also "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016), *cert. denied sub. nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, (U.S. Oct. 3, 2016) (No. 15-1317).

### B. Grounds for Termination of Parental Rights

1. Abandonment by Failure to Support

We begin by reviewing the juvenile court's finding that Father abandoned his children by his willful failure to support them. The parental termination statute enumerates abandonment as the first ground for termination of parental rights. Tenn. Code Ann § 36-1-113(g)(1). There are five alternative definitions of abandonment listed in Tennessee Code Annotated § 36-1-102(1)(A). Abandonment, under Tennessee Code Annotated § 36-1-102(1)(A)(i), "is defined as the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640

8

(Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2015). Because the petition was filed on July 21, 2014, the relevant four-month period is March 20, 2014, to July 20, 2014, the day before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

In order to terminate parental rights on the ground of abandonment, the court must find the abandonment to be willful. "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

Father concedes he has never paid child support towards Jeramyah and Kaydee, including during the relevant four-month period. Rather, he argues his failure to pay was not willful. This Court has recognized that a parent's failure to support a child is not willful if the parent is financially unable to do so. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014). Failure to pay is not enough to establish willfulness. We must determine whether Father had the financial ability, or capacity, to pay support. *Id.*

After our review of the record, we conclude Father's failure to pay support was willful. Although the precise date of Father's change of employment is uncertain, the evidence does not preponderate against the juvenile court's finding that Father was consistently employed during the relevant four-month period. Either he was working at PepsiCo making approximately $1,000 per week, or he was self-employed at the time making about $700 per week. There is no evidence suggesting more than a brief break between the two jobs.

In his brief, Father takes issue with the volume of evidence, or lack thereof, related to his expenses. *See In re B.L.*, No. M2003-01877-COA-R3-PT, 2004 WL 2451355, at *10 (Tenn. Ct. App. Nov. 1, 2004) (holding DCS did not meet its burden of establishing willfulness when the record contained insufficient evidence of mother's basic living expenses and the consistency of her work). Even though the record contains sparse evidence of Father's expenses and debts, Father gave sufficient estimates in his testimony at trial to allow the juvenile court to properly find he had the ability to pay the ordered $100 per month in child support.

Moreover, Father does not argue that he was unable to pay. He argues instead that he was unaware of the court order requiring him to pay child support. We do not find this

argument persuasive. Although he claimed it was his belief that the juvenile court reserved ruling on child support in the December 2013 hearing, the court's order states otherwise, and Father and his attorney were present at the hearing. Additionally, as this Court has previously held, "the obligation to pay support exists even in the absence of a court order to do so." *State v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004).

We also find Father's second excuse unjustifiable. He contends that either DCS or the juvenile court failed to provide him with a TCSES number. However, he admitted to never attempting to obtain a TCSES number, and the December 2013 court order provided an address to which Father could have mailed child support payments. This argument is also undercut by Father's failure to pay after being provided with a TCSES number at the hearing on the petition.

2. Abandonment by Failure to Provide a Suitable Home

The juvenile court then found Father abandoned his children under the second statutory definition of abandonment by failing to provide a suitable home. A child has been abandoned under this statutory definition if the child has been removed from the home of a parent as a result of a finding that the child was dependent and neglected, and "for a period of four (4) months following the removal, the department . . . has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but . . . the parent . . . ha[s] made no reasonable effort[] to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date." Tenn. Code Ann. § 36-1-102(1)(A)(ii). DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal." *Id.* In reviewing this ground for termination, we consider the actions of DCS and Father from October 3, 2013, to February 3, 2014.

The record reflects that Father obtained sufficient housing during the relevant time period and that he maintained appropriate housing through trial. He also executed many of the steps required of him in the permanency plan. But DCS contends, and the juvenile court agreed, Father's unwillingness to disassociate himself from Mother caused his home to be unsuitable because Mother's drug use is a danger to the children. In fact, the juvenile court based its finding of this ground for termination entirely on Mother's continued drug use and the court's belief that Father was still in an ongoing relationship with her.

We note that a "suitable home" means more than adequate "physical space." *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). "[A] home may be rendered unsafe and unsuitable by the conduct of its occupants." *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *18 (Tenn. Ct. App. June 16, 2011). DCS does not contend that

10

Father's conduct rendered his home unsuitable. Instead, DCS's argument focuses on Mother's conduct.

There is little evidence to suggest that Mother was living with Father during the relevant four-month period, and the juvenile court did not make such a finding. Rather, there is only sufficient evidence in the record to establish that Mother was living with Father from July 2014, upon her release from drug treatment, to late February 2015 when Father was charged with domestic assault. There is also evidence that Mother may have been staying in Father's home in April 2015 after her apparent relapse and that Mother was present in Father's home in September 2015 following the birth of their third child.  Based on this record, we conclude there is insufficient evidence that Father's relationship with Mother rendered his home unsuitable.
We may consider Father's more recent behavior in evaluating the evidence on this ground. *Id.* Still, we conclude there is insufficient evidence that Father's relationship with Mother rendered his home unsuitable. Although Father openly allowed Mother to live with him for several months following her release from drug treatment, DCS approved of the arrangement at the time and allowed Mother and Father to exercise joint visitation with the children. DCS also arranged family counseling sessions in December 2014 and January 2015.

DCS listed Father's interaction with Mother as a concern in the initial permanency plan and all three revised permanency plans, but we cannot fault Father for his continued contact with her when the record indicates DCS, at times, encouraged such contact. DCS allowed Mother and Father to exercise joint visitation with the children and also arranged family counseling sessions in December 2014 and January 2015. Also, bBecause Father and Mother had another child together, some interaction between them became inevitable and necessary. The juvenile court specifically found Mother was not living in Father's home, despite her presence there in September 2015. The evidence does not preponderate against this finding, and there is insufficient evidence in the record that Mother was spending unnecessary amounts of time in Father's home following her relapse.

3. Persistence of Conditions

The court also found Father's parental rights should be terminated based on persistence of conditions. Tennessee Code Annotated § 36-1-113(g)(3) authorizes termination of parental rights when:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or

11

neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 549.

DCS removed the children from Father's home in 2013 because Father allowed the children to have unsupervised visitation with Mother and Maternal Grandmother in violation of the Immediate Protection Agreement. The concerns were Mother's drug abuse and her exposure of the children to drugs. In its order terminating Father's parental rights, the juvenile court found that the only condition preventing the children's return to Father was that he "continues to maintain a home for these children not free from [Mother] despite her continued use of illegal drugs." Here, it is again evident that the court's focus was on Father's relationship with Mother.

We agree that Mother's drug abuse is an ongoing problem; nonetheless, our careful review of the record leads us to conclude that there is insufficient evidence that Father's home was "not free from [Mother]." The juvenile court's finding that Father was still in an ongoing relationship with Mother at trial appears to be based on Father's lack of credibility, Mother's presence at his home during the day on September 22, 2015, and the DCS caseworker's belief that Father and Mother remain in contact with one another.

The juvenile court did not find Father's testimony that he and Mother are no longer in a relationship to be credible. Even so, there was not sufficient proof to the contrary. The parents' caseworker testified that, after the couple's alleged separation in the early part of 2015, it was her belief that Father continued to contact Mother. This was based on Mother's knowledge of the developments in Father's case. And on one occasion in the weeks following the birth of the parents' third child, the caseworker discovered Mother at Father's home caring for the newborn while Father was at work.

This proof does not lead us to conclude that these parents are in a relationship that goes beyond co-parenting. In addition, Father apparently had custody of his third child with Mother at the time of the final hearing, and there is no evidence of a court order or an agreement prohibiting Mother from having contact with that child. Because Father was

12

attempting to share parenting responsibilities with Mother, DCS's opposition to Father's contact with Mother put him in a very difficult position. For this reason, we again decline to fault Father for remaining in contact with Mother.

Thus, as to the first statutory element, we conclude the evidence is less than clear and convincing evidence that this condition remained at the time of the hearing and would cause the children to be subjected to further abuse or neglect. Because we cannot conclude that DCS has proven the first statutory factor and this ground for termination requires clear and convincing evidence of all three factors, we need not consider the remaining factors. DCS did not carry its burden of establishing persistence of conditions as a ground for termination.

4. Substantial Noncompliance with Permanency Plan

Finally, we consider the juvenile court's finding that DCS failed to prove Father's substantial noncompliance with the permanency plan as a ground for termination. Under Tennessee Code Annotated § 36-1-113(g)(2), parental rights may be terminated when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . . ." Tenn. Code Ann. § 36-1-113(g)(2). But before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014)). If the permanency plan requirements are reasonable, the court must then determine if the parent's noncompliance was substantial. *Id.* at 548-49. In other words, the unsatisfied requirements must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). In analyzing this ground, the focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009).

First, we conclude many of the permanency plan requirements were reasonable and related to remedying the conditions that led to his children's removal. As previously discussed, the children were removed from the home because Father allowed them to have unsupervised contact with Mother in violation of the Immediate Placement Agreement. Among other things, the plans required Father to maintain appropriate housing and legal income, develop a written budget and a written child care and transportation plan, participate in a parenting class, complete a parenting assessment and follow recommendations, and complete an anger management course. These requirements sought to ensure Father could provide a safe and stable home for Jeramyah and Kaydee.

Next, we must determine whether Father's noncompliance with these reasonable

13

requirements was substantial. Shortly after the children's removal, Father completed the required parenting class and the clinical assessment with a parenting component. He also followed the resulting recommendations. After the permanency plan was amended, Father also completed an anger management course. He consistently maintained adequate income and housing, and he provided DCS with each of his leases. While Father was often uncooperative with DCS, he had accomplished the majority of the remaining requirements by the time of the final hearing. Prior to the final hearing, Father provided DCS with a budget, sufficient proof of income, and a child care and transportation plan. He also completed a second anger management course. Thus, we agree with the juvenile court that the proof does not rise to the level of clear and convincing evidence of substantial noncompliance with the requirements of the permanency plans.

## C. BEST INTERESTS OF THE CHILDREN

We have found that DCS has proven one ground for termination of Father's parental rights, abandonment by failure to support, so we now turn to the issue of whether termination is in the best interests of the children. Because "[n]ot all parental misconduct is irredeemable, . . . Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i)[7] lists nine factors that courts may consider in making a best interest analysis. The

---

[7] The statutory factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in

14

focus of this analysis is on what is best for the child, not what is best for the parent. *Id.* at 499. At the same time, "the inquiry should address itself to the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

We hold that DCS has proven termination of Father's parental rights is in the children's best interests. Although we credit Father with maintaining regular visitation with the children, the evidence does not preponderate against the juvenile court's finding that Father does not have a meaningful relationship with them. Kaydee has been in state custody her whole life, and Jeramyah continues to express that he fears Father. Additionally, due to Father's own conduct, he is only permitted supervised visits with the children.

While we also credit Father with obtaining suitable housing, Father has demonstrated his inability to control his anger, causing concern about the safety and stability of his home. DCS caseworkers first became concerned with Father's angry outbursts after the children's removal, leading DCS to recommend that Father take an anger management course. Then, as Jeramyah's counselor testified, Father became angry at Jeramyah for expressing his feelings during a family counseling session, and later, Father was charged with domestic assault against Mother.

Furthermore, Father's unwillingness to pay child support for the two years preceding the termination of his parental rights led the juvenile court to find that Father "abandoned [his] children financially." Again, we must agree. The children's foster family wishes to

---

the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances, or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

adopt them, and based on the testimony of caseworkers, Jeramyah and Kaydee have a strong bond with them. According to Jeramyah's counselor, he is afraid of Father and afraid of being returned to him. The children's foster family supports them and meets their needs, and changing caregivers would be detrimental to the children.

### III. CONCLUSION

We conclude DCS did not meet its burden of proving failure to provide a suitable home, persistence of conditions preventing reunification, or substantial noncompliance with the permanency plan. However, DCS did prove by clear and convincing evidence that Father abandoned his children by willful failure to support them. There is also clear and convincing evidence to support the court's conclusion that terminating Father's parental rights is in the children's best interest. Accordingly, we affirm the juvenile court's decision to terminate Father's parental rights.

_____
W. NEAL MCBRAYER, JUDGE

16